Not For Publication

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                )
IN RE:                          )        CASE NO.          06-30034(LMW)
                                )
   DATICON, INC.,               )        CHAPTER           7
                                )
           DEBTOR.              )        DOC. I.D. NOS.    565, 567, 591
- - - - - - - - - - - - - - - - - - - - - - - - - - - -

## APPEARANCES

David M.S. Shaiken, Esq.                 Attorney for the Chapter 7 Trustee
Reid & Riege, P.C.
One Financial Plaza
755 Main Street
Hartford, CT 06103

James Berman, Esq.                       Attorney for Liberty Bank
Zeisler & Zeisler, P.C.
558 Clinton Avenue
Bridgeport, CT 06605

## MEMORANDUM AND ORDER GRANTING TRUSTEE'S MOTION TO APPROVE COMPROMISE AND TO APPROVE STIPULATION OF SETTLEMENT

Lorraine Murphy Weil, United States Bankruptcy Judge

The matters before the court are (a) that certain Motion by Ronald I. Chorches, Chapter 7 Trustee, To Approve Compromise with CapitalSource Finance LLC, William Henrich, Howard Herman, Joel Getzler, and Alan Kolod and To Approve Stipulation of Settlement (Doc. I.D. No. 565, the "Motion To Approve Settlement")[1] filed by the chapter 7 trustee (the "Trustee"), (b) that certain objection (Case Doc. I.D. No. 591, the "Liberty Bank Objection") filed by Liberty Bank ("Liberty

---

[1]      References herein to the docket of this case are in the following form: "Doc. I.D. No. ___."

Bank"), an unsecured creditor in this case, to the Motion To Approve Settlement and (c) that certain

Motion To Borrow from Webster Bank (Doc. I.D. No. 567, the "LOC Motion") filed by the Trustee.

This court has jurisdiction over these matters as core proceedings pursuant to 28 U.S.C. §§ 157 and

1334, 11 U.S.C. §§ 105 and/or 363,[2] Rule 9019 of the Federal Rules of Bankruptcy Procedure and that

certain Order dated September 21, 1984 of the District Court (Daly, C.J.).[3]

This memorandum constitutes the findings of fact and conclusions of law required by Rule 7052

of the Federal Rules of Bankruptcy Procedure (made applicable here by Rule 9014 of those rules).

## I.    CHAPTER 11 PHASE OF CASE

The above-referenced debtor (the "Debtor") commenced this case by a chapter 11 petition filed

on January 17, 2006.  (*See* Doc. I.D. No. 1.)  Relevant events in the chapter 11 phase of this case are

as follows.  For the duration of the chapter 11 phase of this case, the Debtor remained in possession and

control of its assets and business affairs as debtor in possession pursuant to Bankruptcy Code §§ 1107

and 1108.  The petition was accompanied by a full set of schedules (Doc. I.D. Nos. 3 and 4,

collectively, the "Schedules") and a Statement of Financial Affairs (Doc. I.D. No. 5, the "SOFA").  In

relevant part, the Schedules state that, as of the petition date, the Debtor had assets with an aggregate

value of $9,752,592.79 and liabilities aggregating $21,743,398.83.  (*See* Doc. I.D. Nos. 3 and 4.)[4]

---

[2]        As to the statutory authority with respect to the Motion To Approve Settlement, see the court's discussion in *Hicks, Muse & Co., Inc. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 50 n.4 (1st Cir. 1998).

[3]        That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceedings . . . arising under . . . Title 11, U.S.C. . . . or arising in . . . a case under Title 11, U.S.C. . . . ."  References herein to title 11 of the United States Code or to the Bankruptcy Code are references to the same as they appeared prior to the effective date of their amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

[4]        The Claims Register in this case shows $13,352,899.00 in filed (but unreviewed) unsecured claims (excluding administrative and priority tax claims).  (*See* Trustee Exh. (as hereafter defined) 3.)

Schedule D (Creditors Holding Secured Claims) lists "Capital Source LLC" as a secured creditor with respect to the Debtor's "business assets" with a claim in the stated amount of $18,631,613.65. (*See* Doc. I.D. No. 4.).[5] With respect to item number 1 of the SOFA, the SOFA lists income from the operation of the Debtor's business as follows: (a) $47,216,756.00 with respect to 2003; (b) $32,738,552.00 with respect to 2004 and (c) $20,736,000.00 with respect to 2005. (*See* Doc. I.D. No. 5.)

The filing of the Debtor's chapter 11 petition also was accompanied by "first day" applications, with relief sought on an expedited basis. Those applications included: (a) a motion (Doc. I.D. No. 9, the "Sale Motion") by the Debtor to sell its assets free and clear of liens pursuant to Bankruptcy Code § 363; (b) the Debtor's application (Doc. I.D. No. 11, the "Mirus Application") to employ Mirus Capital Advisors, Inc. ("Mirus") as the Debtor's "financial consultant" to, among other things, help the Debtor sell its assets;[6] (c) the Debtor's application (Doc. I.D. No. 12, the "TRG Application") to employ TRG, Inc. ("TRG") to provide management and consulting services to the Debtor; and (d) the Debtor's motion (Doc. I.D. No. 13, the "Borrowing Motion") to obtain postpetition financing from CSF on a secured and priority basis.[7] The Sale Motion was premised upon a "stalking horse" bid (already produced by Mirus, the "Xiotech Bid") from Xiotech Corporation ("Xiotech") for substantially all of the Debtor's assets which bid was memorialized in an Asset Purchase Agreement which provided for sale consideration to the estate as follows: (a) $19,000,000.00 for a closing on or prior to February 10,

---

[5]    The correct and/or present name of that entity appears to be CapitalSource Finance LLC ("CSF").

[6]    The Mirus Application sought approval of the Debtor's postpetition retention of Mirus pursuant to Bankruptcy Code § 327, and approval of Mirus' proposed compensation package pursuant to Bankruptcy Code § 328. (*See* Doc. I.D. No. 11.)

[7]    The Borrowing Motion had both a use of cash collateral component and a new credit component. (*See id.*)

2006; (b) $18,000,000.00 for a closing between February 11, 2006 and February 18, 2006, inclusive;

(c) $17,000,000.00 for a closing between February 19, 2006 and February 26, 2006, inclusive; and

(d) $16,000,000.00 for a closing between February 27, 2006 and March 6, 2006, inclusive.  (*See* Doc.

I.D. No. 13, Exhibit A.)

The Borrowing Motion, the Mirus Application and the TRG Application were originally

scheduled to be heard on January 18, 2006.  The Mirus Application and the TRG Application were

continued in open court to January 24, 2006.  The Borrowing Motion was heard as scheduled and was

granted on an interim basis by an order entered on January 19, 2006.  (*See* Doc. I.D. No. 33, the

"Interim Financing Order".)  The Interim Financing Order authorized interim financing not to exceed

$300,000.00 pending a final hearing on January 24, 2006.  In relevant part, the Interim Financing Order

further provided:

> [A] trustee . . . appointed in the Case . . . shall not be prohibited by this Order from
> contesting by way of an adversary proceeding under Rule 7001 the validity, perfection,
> extent, enforceability or priority of . . . [CSF's] pre-petition liens, mortgages and
> security interests in the Pre-Petition Collateral or the amount of the Pre-Petition
> Obligations, or from any defenses, offsets or counterclaims thereto if (and only if) any
> such complaint is filed with the Court not more than forty-five (45) days after the
> earliest of the following dates, or be thereafter forever barred therefrom:  . . .  (ii) the
> entry of an order appointing such a trustee or (iii) the meeting of creditors held pursuant
> to section 341 of the [Bankruptcy] Code.

(Doc. I.D. No. 33 ¶ 24 (the "Bar Provision").)

The United States Trustee appointed a committee (the "Committee") of unsecured creditors

pursuant to Bankruptcy Code § 1102 on January 23, 2006.  (*See* Doc. I.D. No. 47.)[8]  The hearings on

all the pending motions were continued to January 26, 2006.  On that date, the Committee filed

---

[8]    The members of the Committee were: Liberty Bank; The Oliver Group and Norwich
Public Utility.  (*See id.*)  Reid and Riege, P.C. was retained by the Committee as counsel ("Committee
Counsel") and that retention was approved by order dated February 21, 2006.  (*See* Doc. I.D. No. 191.)

objections to the TRG Application, the Mirus Application and the Sale Motion. (*See* Doc. I.D. Nos. 74, 75 and 77.) Liberty Bank also filed objections to the TRG Application (*see* Doc. I.D. Nos. 92, the "Liberty Bank TRG Objection"), and to the other motions.[9] At the January 26, 2006 hearing, all the objectors withdrew their respective objections to the Sale Motion with a reservation of rights, and an order establishing sale procedures was entered on January 30, 2006. (*See* Doc. I.D. No. 100, the "Sale Procedures Order".) The Committee filed an objection to the Borrowing Motion (*see* Doc. I.D. No. 97), and the Interim Financing Order was extended first to January 30, 2006 and then to February 2, 2006 with the final hearing thereon continued to February 2, 2006. (*See* Doc. I.D. Nos. 99, 109.) A hearing on the Mirus Application (and objections thereto) was continued to January 30, 2006 and then to February 9, 2006.

The TRG Application (and the objections thereto) came on for an evidentiary hearing on January 26, 2006 and was denied (and the objections sustained) pursuant to a ruling announced from the bench on January 30, 2006. (*See* Doc. I.D. Nos. 102, 103, 104.) In reaching its decision, the court noted some prepetition connections between TRG and CSF, the threat of a lender liability action against CSF articulated in the Liberty Bank TRG Objection, and that TRG likely would be a co-defendant with CSF or, at least, a likely witness for CSF in any such action. Based upon the foregoing (and drawing no conclusion as to the merits of any claim against CSF), the court concluded that there was a potential conflict between TRG and the estate which created enough of an appearance of impropriety to warrant

---

[9]        Objections also were filed to the subject motions by persons and entities other than the Committee and Liberty Bank.

denial of the TRG Application (and a sustaining of the objections).  (*See* Doc. I.D. No. 606 at 25-27

(amended transcript of January 30, 2006 hearing, bench ruling).)[10]

The Borrowing Motion came on for an evidentiary hearing on February 2, 2006.  CSF insisted

that any financing order contain a provision that provided for payment of its debt on closing of the

impending sale.  Because the court would not approve such a provision, CSF withdrew its consent to

the Borrowing Motion and the Debtor proceeded solely on the cash collateral component of the

Borrowing Motion on a nonconsensual basis.  Based on the record made, the court found CSF's

security interest in cash collateral to be adequately protected by the impending sale on certain

conditions.  (*See* Doc. I.D. No. 470 (transcript of February 2, 2006 hearing) at 93-95 (court's ruling).)[11]

Orders approving the Debtor's use of cash collateral for one week (and sustaining the objections only

to the extent of new credit) were entered.  (*See* Doc. I.D. Nos. 128, 129, 140.)  The "cash collateral

order" was extended from time to time.

The Mirus Application came on for an evidentiary hearing on February 9, 2006.  At that

hearing, the court stated that the compensation formula proposed for Mirus in the Mirus Application

---

[10]     In connection with its ruling, the court found the following facts:

Sometime [sic] pre-petition the debtor went into default under the CSF loan
documents.  On account of that default and pursuant to those documents, or other related
documents not in evidence, around May or June of 2005 CSF exercised a right to select
a new chairman of the debtor's board of directors . . . .

The new chairman . . . then appointed [three] other board members [collectively
with the chairman, the "New Board"] . . . .

(*Id.* at 16.)

[11]     Mr. James Bologa, the Debtor's Executive Vice-President and Chief Financial Officer,
testified at that hearing that, if the Asset Sale did not happen and the Debtor were forced to shut down
on February 9, 2006, the Debtor would be unable to pay about $500,000.00 in post-petition obligations.
(*See* Doc. I.D. No. 470 (transcript of February 2, 2006 hearing) at 65.)

was inappropriate in light of the existence of the Xiotech Bid as of the petition date. (*See* Doc. I.D. No. 348 (transcript of February 9, 2006 hearing) at 80-81.)  Rather than suffer certain disapproval of the Mirus Application as it then stood, the parties negotiated Mirus' compensation formula downward and an order approving the Mirus Application on that basis was entered on February 14, 2006. (*See* Doc. I.D. No. 177 (the "Mirus Order").)

An auction held pursuant to the Sale Procedures Order was conducted on February 14, 2006. Xiotech emerged as the successful bidder with a winning bid of $29,100,000.00 (subject to adjustment). An order approving that transaction was entered on February 16, 2006. (*See* Doc. I.D. No. 180, the "Sale Order.") That sale (the "Asset Sale") closed on February 22, 2006 with the Debtor receiving cash proceeds of approximately $27,500,000.00.  On February 24, 2006, CSF filed a motion to disburse Asset Sale proceeds in satisfaction of its secured claim.  (*See* Doc. I.D. No. 217, the "CSF Disbursement Motion.")  The CSF Disbursement Motion was granted with respect to principal, interest and certain miscellaneous fees by an order entered on April 4, 2006 (Doc. I.D. No. 324, the "Partial Payment Order").  The Partial Payment Order further provided in relevant part as follows:

> 3.      With respect to CapitalSource's request for payment of its legal fees and expenses, CapitalSource's counsel, in accordance with local practice, shall submit a form of fee application.

> 4.      With respect to the letter of credit issued as part of and under CapitalSource's loans, the Debtor and/or Estate shall reserve $110,250.00 in cash. When and if a draw is made under the letter of credit, CapitalSource shall deliver reasonable evidence of the same to the Debtor and Creditors' Committee. Unless either of those parties files in this Court and serves an appropriate objection within five (5) days thereafter, then the Debtor and/or Estate shall disburse the foregoing amount to CapitalSource.

> 5.      Until further order of this Court, the Debtor and/or Estate also shall reserve $1,725,000.00 in cash on account of amounts which may become distributable to CapitalSource on account of the Exit Fee [as hereafter defined], Mirus Reimbursement [as hereafter defined] and legal fees and expenses.

(Doc. I.D. No. 324.)

By order dated April 3, 2006, the court denied the Debtor's application to reimburse Mirus for certain fees incurred by it in connection with the Mirus Application. (*See* Doc. I.D. No. 320.) By order dated April 6, 2006, the court approved payment of compensation to Mirus in the amount of $1,016,692.20 in fees and $30,000.00 in expense reimbursements. (*See* Doc. I.D. No. 335.) That amount was about $400,000.00 less than the compensation originally sought in the Mirus Application.

For a brief while, it appeared that the Asset Sale in this case would produce a substantial dividend for general unsecured creditors if not a solvent estate. However, it became apparent to the Committee that a large capital gains tax (ultimately calculated at in excess of $8,000,000.00, the "Capital Gains Tax") would be payable as an administrative expense from the proceeds of the Asset Sale.[12]  On May 4, 2006, the Committee filed a motion to convert the case to a chapter 7 liquidation under the direction of a chapter 7 trustee. (*See* Doc. I.D. No. 381, the "Conversion Motion.") The Debtor and CSF objected to the case conversion. (*See* Doc. I.D. Nos. 396, 398.)  After a hearing on the Conversion Motion on May 10, 2006, the Conversion Motion was granted and the objections thereto overruled. (*See* Doc. I.D. Nos. 405, 406, 407.)[13]

---

[12]      The taxing authorities also have another priority tax claim (in the approximate amount of $1,500,000.00, the "Priority Tax Claim") for prepetition taxes due. (*See* Hearing Transcript (as hereafter defined) at 31 (Trustee's testimony concerning the history of the Priority Tax Claim).)

[13]      It was first disclosed to the court at the May 10, 2006 hearing (and in related pleadings) that CSF had agreed to indemnify the New Board when the New Board was put in place, and that CSF had a small equity position in Daticon Holding Corporation ("Holding"), the equity owner of Daticon. (*See* Doc. I.D. No. 420 (transcript of May 10, 2006 hearing) at 30 (remarks of CSF's counsel). *See also* Trustee Exh. 9, tab 3 ("Schedule of Purchasers").)

## II.     CHAPTER 7 PHASE OF THE CASE

Ronald I. Chorches, Esq. was appointed as the Trustee.  The Trustee retained the Committee Counsel as his special counsel ("Special Counsel") to:

(a)  Investigate causes of action which the Trustee may prosecute for the benefit of the Debtor's estate;

(b)  Defend the Trustee in connection with a pending motion by CapitalSource Funding LLC for Distribution of Sale Proceeds To Secured Creditor filed on or about February 24, 2006; and

(c)  Provide such other legal advise and services as are necessary to assist the Trustee in performing his duties under the Bankruptcy Code.

(Doc. I.D. No. 429.)  That retention was approved by the court pursuant to an order dated June 15, 2006.  (Doc. I.D. No. 440.)  The Trustee also retained Blum Shapiro Litigation Consulting Group ("Blum Shapiro") to provide certain accounting and litigation support services including with respect to the Capital Gains Tax, other tax matters, the identification of assets and sources of recovery for the estate, and assisting "the Trustee in pursuing any actions initiated as a result of Blum Shapiro's analysis . . . ," (*id.*).[14]  The Blum Shapiro retention was approved by order dated June 7, 2006.  (*See* Doc. I.D. No. 430.)

On June 21, 2006, the Trustee filed a motion (Doc. I.D. No. 446) seeking an order "modifying or clarifying, or [granting] relief from" the Bar Provision.  (*See id.*)  CSF filed an objection to that motion.  (*See* Doc. I.D. No. 460.)  The subject motion (and the objection thereto) was resolved by a stipulation (the "Bar Date Stipulation") placed on the record in open court on June 30, 2006 pursuant to which CSF and the Trustee agreed to extend the Bar Date to September 26, 2006.  The Bar Date Stipulation was extended on consent thereafter from time to time.

---

[14]      Blum Shapiro had been the debtor in possession's accountants.  (*See id.* ¶ 6.)

The Trustee filed the Motion To Approve Settlement and the related LOC Motion on November 3, 2006. The court approved an application of the Trustee to increase the "fee cap" of Blum Shapiro from $80,000.00 to $170,000.00 by an order dated November 22, 2006. (*See* Doc. I.D. No. 586.) The court further approved payment of compensation to Special Counsel in the amount of $178,319.50 for fees and $14,485.04 for expense reimbursement for services rendered to the Trustee through September 30, 2006 by order dated November 27, 2006. (*See* Doc. I.D. No. 590.)[15] Liberty Bank filed the Liberty Bank Objection on November 27, 2006.[16] By order dated December 4, 2006, the court increased Special Counsel's "fee cap" in respect of CSF litigation to $175,000.00. (*See* Doc. I.D. No. 601.) By order dated December 6, 2006, the court approved compensation to Blum Shapiro for the period May 12, 2006 to October 25, 2006 in the amount of $79,486.95 for fees and $402.74 for expense reimbursement.[17] On December 13, 2006, the Trustee filed an application to retain his law firm to represent the Trustee in the pursuit of recoveries in this case from sources other than CSF and/or the New Board. (*See* Doc. I.D. No. 613.)

---

[15]    About $150,000 of that award related to services rendered in respect of actual or anticipated litigation with CSF. (*See* Doc. I.D. No. 546, Exhibit B-2.) The Trustee desired to pay that expense before the end of the calendar year in order to be in a position to deduct the same from the Capital Gains Tax. (*See id.* ¶ 11.)

[16]    People's Bank and Osmose, Inc. ("Osmose") also filed objections to the Motion To Approve Settlement. (*See* Doc. I.D. Nos. 592, 593.) Those other objections adopted the Liberty Bank Objection. (*See id.*) By orders dated November 29, 2006, those objections were overruled as untimely filed. (*See* Doc. I.D. Nos. 597, 598; *cf.* Doc. I.D. No. 575 (notice of hearing setting filing deadline for objections).)

[17]    Of the amounts sought, $20,712.50 in fees related to "[l]itigation [m]atters." (*See* Doc. I.D. No. 578 (Exhibit E).)

III.   **THE MOTION TO APPROVE SETTLEMENT, THE RELATED STIPULATION, THE LOC MOTION AND THE LIBERTY BANK OBJECTION**

The Motion To Approve Settlement seeks this court's approval of a certain Stipulation (the "Stipulation") annexed thereto.  (*See* Doc. I.D. No. 565.)  The background of the Stipulation (as recited therein) is as follows:

**Recitals**

WHEREAS:

A.   On or about September 5, 2003 the Debtor and CSF entered into that certain Revolving Credit, Term Loan and Security Agreement dated as of September 5, 2003 as from time to time amended and restated and related documents **(collectively, the "Loan Agreement")** pursuant to which CSF made a $21,000,000 term loan to the Debtor, and provided a $10,000,000 revolving line of credit to the Debtor **(collectively, the "CSF Loans").**

B.   The CSF Loans were used, in part, to fund the purchase of the Debtor's stock on or about September 5, 2003 by Daticon Holding Corporation in a leveraged buyout transaction.

C.   CSF maintains a first-priority, perfected security interest in substantially all of the Debtor's assets pursuant to the Loan Agreement.

D.   Pursuant to the Loan Agreement, CSF has posted a certain letter of credit issued by LaSalle Bank, N.A., number S566912, as amended, in favor of the Connecticut Development Authority **("CDA")**, in the amount of $105,000 **(the "Letter of Credit")**.  To the best of the parties' knowledge, the Letter of Credit is outstanding.

E.   The Loan Agreement provides that the Debtor shall pay to CSF an Exit Fee, as follows:

3.4 Exit Fee

Notwithstanding any other provision of this Agreement, if Borrowers make or are required to make payment in full of the Term Loan (whether on the Maturity Date, upon acceleration, upon prepayment or otherwise), then on the date such payment is due and payable, Borrowers shall pay Agent, for the ratable benefit of Term Lenders (in addition to the then outstanding principal, accrued interest, Prepayment Fee, if any, and other Obligations owing pursuant to the terms of this Agreement and any other Loan Document on such date) an amount equal to the Exit Fee. [the "Exit Fee"]

- 11 -

F.      The Loan Agreement provides that the Exit Fee equals $1,250,000.

G.      In 2004 and 2005, the Debtor experienced financial difficulty.

H.      On May 16, 2005, CSF exercised certain contractual rights under the Loan Agreement, and replaced the members of the Debtor's board of directors by electing the New Board[18] to the Debtor's board of directors.

I.      On or about May 16, 2005, CSF and the New Board entered into an Indemnification Agreement by and among CSF and the New Board pursuant to which CSF agreed to indemnify the New Board in accordance with the terms thereof **(the "Indemnification Agreement")**.

J.      On or about October 27, 2005, the Debtor engaged Mirus . . . as its investment banker pursuant to that certain Exclusive Mergers and Acquisitions Advisory Agreement . . . .

K.      On or about November 2, 2005, CSF and Mirus entered into that certain Payment of Investment Banking Fees and Carve-Out Agreement **(the "Carve-Out Agreement")**.

L.      On or about January 17, 2006, the Debtor filed a voluntary petition for relief under chapter 11, Title 11 of the United States Code in the United States Bankruptcy Court for the District of Connecticut . . .

M.      On or about January 17, 2006, the Debtor filed a motion in the Court seeking to sell substantially all of its assets to Xiotech . . . pursuant to 11 U.S.C. § 363.

N.      On or about January 17, 2006, the Debtor filed . . . [the Mirus Application].

. . .

R.      Subsequently, [based upon certain remarks from the Court] Mirus and the Debtor agreed to a fee structure that was less remunerative than the fee structure . . . [proposed in the Mirus Application].

S.      On February 14, 2006, the Debtor conducted a competitive auction of its assets.  Xiotech was the successful bidder.  Xiotech's bid was in the amount of $29,100,000.  Subsequently, the Court approved Xiotech's bid and the Debtor's assets

---

[18]      The New Board was composed of Messrs. William Henrich, Howard Herman, Joel Getzler and Alan Kolod.  (*See* Stipulation at 1-2.)  The board of directors replaced by the New Board is referred to hereafter as the "Thoma Cressey Board."

were sold to Xiotech on February 26, 2006 for an adjusted sale price of approximately $29,833,844.

T.    Thereafter, the Court allowed compensation to Mirus in an amount that was $400,000 less than Mirus would have been paid under the Mirus . . . [Application].

U.    On or about February 24, 2006, CSF, as the oversecured, senior secured lender, filed . . . [the CFS Disbursement Motion] seeking payment under the CSF Loans of (i) principal and interest on its secured claim, (ii) the Exit Fee, (iii) reimbursement of the difference between the amount of compensation that Mirus would have been paid under the Mirus . . . [Application] and what Mirus was actually paid pursuant to the Court's order allowing Mirus' compensation, minus $75,000, plus certain out-of-pocket expenses for which Mirus had sought reimbursement but which the Court denied, and (iv) legal fees and expenses incurred by CSF during the Debtor's bankruptcy case. With regard to CSF's claim for reimbursement of the Mirus compensation and expenses **(the "Mirus Reimbursement")**, CSF claimed that it was obligated to pay said sums to Mirus under the Carve-Out Agreement.

V.    By [the Partial Payment O]rder . . . , the Court allowed payment of approximately $14,882,422.31 to CSF, consisting of $14,800,344.14 of principal and $82,078.17 of interest and miscellaneous fees. The Court also (i) ordered that an evidentiary hearing be held concerning CSF's claim to the Exit Fee and the Mirus Reimbursement, and (ii) ordered CSF to file an application for reimbursement of attorneys' fees pursuant to Fed. R. Bankr. P. 2016 and the local rules of the Court.

. . .

CC.    CSF alleges that it paid to Mirus approximately $350,000 on account of the Mirus Reimbursement.

. . .

EE.    The Trustee maintains (i) the grant to CSF of a security interest in the Debtor's assets is avoidable as a fraudulent transfer, (ii) CSF is liable to the Estate for lender liability arising out of CSF's alleged conduct during CSF's administration of the CSF Loans, and (iii) the New Board is liable to the Trustee for beach of fiduciary duty and other causes of action related to their conduct as members of the New Board. CSF disputes and denies each of the Trustee's allegations.

FF.    CSF maintains the Estate is liable for payment of (i) the Exit Fee, (ii) the Mirus Reimbursement and (iii) CSF's attorneys' fees. The Trustee disputes and denies each of CSF's allegations. In the alternative, the Trustee maintains that in the event the Estate is liable for one or more of the foregoing, the amounts sought by CSF are unreasonable and therefore should be reduced by the Court. CSF disputes and denies each of the Trustee's claims and defenses concerning the Exit Fee, the Mirus Reimbursement and CSF's attorneys' fees.

- 13 -

GG.    The total amount sought by CSF in connection with the Payment motion is in excess of $2,048,408.84, consisting of:

| 1.  Exit Fee | $1,250,000.00 |
|---|---|
| 2.  Mirus Reimbursement | $   348,408.84 |
| 3.  Attorneys' Fees | $   400,000.00 |
| 4.  Expert Witness Fees | $     50,000.00 |
| **Total** | **$2,048,408.84** |

HH.    Osmose . . . has recently filed a lawsuit against, *inter alios*, the New Board.  To the best of the parties' knowledge and belief, Osmose claims that the New Board are liable to Osmose on account of some alleged action or inaction by the New Board in their capacities as members of the Debtor's board of directors . . . .[19]

. . .

(Stipulation at 2-9.)

The Motion To Approve Settlement seeks approval of the following settlement (set forth in the Stipulation, the "Proposed Settlement"):

a.    The Trustee shall pay $1,100,000.00 plus, on account of accrued and unpaid fees and charges in connection with the Letter of Credit, $1,228.77 **(collectively, the "Settlement Amount")** to CSF.

b.    The Trustee shall procure CDA's release of the Letter of Credit.  The Trustee anticipates procuring CDA's release of the Letter of Credit by substituting a letter of credit to be issued by Webster Bank in its place.  The Trustee anticipates filing a motion seeking authority to enter into an agreement with Webster Bank in order to facilitate the posting of a substitute letter of credit.[20]

c.    To the extent that CSF makes any payments to or on behalf of the New Board under the terms of the Indemnification Agreement **(the "Indemnity Payments")**, CSF may assert a nonpriority unsecured claim **(the "Subrogation Claim")** against the Estate for the amount of any

---

[19]    The alleged Osmose claims against the New Board are unrelated to the claims that Liberty Bank wishes the Trustee to pursue.

[20]    The LOC Motion is such a motion.

Indemnity Payments as subrogee of the New Board. The Trustee and the Estate reserve their rights to object to CSF's obligation to make the Indemnity Payments and the amount of the Subrogation Claim.[21] The Trustee agrees that the Estate will make no interim distributions to nonpriority unsecured creditors unless he shall have reserved $75,000 on account of the Subrogation Claim.

d.     The payment of the Settlement Amount, and the other covenants and conditions contained in the Stipulation, are in full settlement of:

(i)     all of CSF's claims against the Estate, *provided, however,* that the Stipulation shall not preclude CSF from asserting (1) the Subrogation Claim; (2) any rights or defenses it may have against entities other than the Trustee or the Estate as a result of CSF's equity holdings in Daticon Holding Corporation; and (3) any rights or defenses CSF may have relating to or arising from the Letter of Credit but only until such time as the Trustee delivers the cancelled Letter of Credit to CSF;

(ii)    all of the Estate's claims against CSF, *provided, however,* that the Trustee and the Estate may (i) object to the Subrogation Claim; and (ii) assert and prosecute claims against, and defenses to claims by, Daticon Holding Corporation;

(iii)   all of the Estate's and the Trustee's claims against the New Board through the date of the Stipulation, *provided, however,* that nothing contained in the Stipulation is an admission of liability by the Trustee or the Estate or a waiver of the Trustee's or the Estate's defenses in connection with any claims filed against the Estate by . . . [the New Board], all of which defenses are expressly reserved.

. . .

---

[21]     All of the New Board have filed alleged unliquidated administrative claims for corporate indemnification in this case. (*See* Claims Register (Claim Nos. 45, 46, 47, 49).) Messrs. Getzler and Henrich also have filed alleged administrative claims for corporate indemnification in the respective amounts of $22,484.03. (*See id.* (Claim Nos. 68, 69).) The administrative priority of all of those claims will be contested by the Trustee. (*See* Hearing Transcript at 156 (statement by Attorney Shaiken).) As noted above, CSF agrees that any such allowed corporate indemnification claims which become Subrogation Claims will be general unsecured claims.

      f.     The Stipulation provides for the exchange of releases as follows:

        (i)     The Trustee shall execute and deliver releases to CSF and the New Board;

        (ii)     CSF shall execute and deliver a release to the Trustee.

(Doc. I.D. No. 565 at 8-12.)[22]

The Liberty Bank Objection asserts that the Proposed Settlement is unreasonable and should not be approved, arguing as follows:

> The . . . [Motion To Approve Settlement] proposes that CSF be paid an additional $1,100,000 on top of the approximately $15,000,000 it has already received. When the patently disallowable Mirus . . . [Reimbursement] and the suspect fees and cost, for which the prerequisite application has not been made, are entirely discounted, the . . . [Motion To Approve Settlement] requires, in essence, that the Estate allow CSF $16,100,000 of a $16,250,000 claim (which <u>includes</u> the highly questionable Exit Fee of $1,250,000) and allows both CSF and the New Board to file additional claims against the Estate (adding insult to injury) while the Estate receives nothing from CSF or the New Board on account of the Estate's multimillion dollar claims against them. This can hardly be called a settlement - let alone a reasonable one.

(Doc. I.D. No. 591 at 14.)

## IV.   <u>THE HEARING</u>

As noted above, the Hearing was conducted on November 28, 2006.[23]  At the Hearing, the Trustee testified for himself.  Liberty Bank did not call any witnesses but cross-examined the Trustee.  Only the Trustee introduced documentary evidence into the record.[24]  At the conclusion of the Hearing, the court took the matter under advisement, subject to post-trial briefing.  On December 15, 2006, the

---

[22]     The Proposed Settlement also extends the Bar Provision.  (*See id.* at 16.)  The Proposed Settlement also contains a bonding procedure to permit the parties to "close over" a potential or actual appeal of an order granting the Motion To Approve Settlement.  (*See id.* at 10-12.)

[23]     A transcript of that proceeding is in the record as Doc. I.D. No. 612.  References herein to the record of the Hearing are in the following form: "Hearing Transcript at ____."

[24]     References herein to those exhibits are in the following form: "Trustee Exh. ___."

United States Trustee (the "UST") filed a statement of "no objection" with respect to the Proposed

Settlement which stated in relevant part as follows:  "The U.S. Trustee bases her position on a review

of the pleadings, discussion of the undersigned [counsel] with . . . [the] Trustee and his counsel, as well

as the undersigned's attendance at the . . . [H]earing . . . ." (Doc. I.D. No. 614, the "UST Statement.")[25]

Post-trial briefing now is complete and the matter is ripe for decision.  References to the record of the

Hearing will be made as appropriate in the discussion below.[26]

## V.    THE RECORD OF THE HEARING

At the Hearing, the Trustee testified in relevant part as follows.[27]  The Trustee testified that he

has practiced law for about sixteen years.  He started with a law firm with his father Martin Chorches,

Esq. and Anthony Novak, Esq. in what was primarily a chapter 11 practice representing debtors and

debtors in possession (with some secured lender representation).  (*See* Hearing Transcript at 19.)  In

that setting the Trustee became familiar with issues respecting motions for allowance and payment of

secured claims under Bankruptcy Code § 506(b), lender liability claims, perfection of security interests

and avoidance actions.  (*See* Hearing Transcript at 20.)  The Trustee has been a member of the Panel

of Trustees maintained by the United States Trustee for this district since May, 1997.  (*See id.*)  In that

setting he has continued to deal with Section 506(b) motions, avoidance actions, lender liability claims

and the like.  (*See id.*)  The Trustee has tried numerous cases.  (*See* Hearing Transcript at 61.)

---

[25]    The UST filed the UST Statement at the request of the court that the UST file a statement of position or no position on or before December 18, 2006.

[26]    The facts found throughout this opinion have been taken from the record made at the Hearing and from the entire record of this case.

[27]    The court credits the Trustee's statements of what he did, his opinion and belief and his basis for that opinion and/or belief as true and accurate.  Other factual statements by the Trustee are accepted not as proof of their existence but, rather, as evidence of the basis for the Trustee's decision in respect of the Motion To Compromise.

The Trustee further testified at the Hearing in relevant part as follows.  In order to get "up to speed" in the case, he read all the then-existing transcripts, reviewed the docket and the various motions and immediately went down to the Debtor's headquarters and interviewed several past board members. (*See* Hearing Transcript at 21.)  Early in the chapter 7 phase of this case, the UST and certain creditors encouraged the Trustee to investigate claims against CSF and/or the New Board.  (*See* Hearing Transcript at 23-24.)  The Trustee and his professionals (*i.e.,* Special Counsel and Blum Shapiro) conducted an investigation of those claims.  (*See* Hearing Transcript at 24-25.)  The Trustee spoke daily with Special Counsel about those claims, attended certain depositions and was involved in certain witness interviews.  (*See id.* at 24.)  Special Counsel reviewed somewhere in the area of 30,000 to 40,000 pages of documents.  Special Counsel interviewed about 12 or 13 witnesses who were officers, directors, and professionals who were all involved in the company within the four year period before the chapter 11 filing.  There were at least four depositions taken.  Two of the New Board members were deposed in New York City and certain officers of CSF were deposed in Washington, DC.  (*See* Hearing Transcript at 25.)[28]  The Trustee testified:  "It was an overwhelming amount of work that has been done so far . . . and . . . an overwhelming amount of work that would need to be done . . . if the matter actually would be litigated."  (*Id.* ln. 22-25.)

The Trustee further testified in relevant part as follows with respect to his understanding (based upon his investigation and the investigation of his professionals) of the history of the Debtor, its relationship with CSF and the New Board.  As its business, the Debtor scanned and coded large

---

[28]     Special Counsel's recollection of what he did is slightly different and may be more accurate.  (*See* Hearing Transcript at 9-10 (remarks of Attorney Shaiken).)  Special Counsel confirmed at the Hearing that, because of the Bar Provision (as amended from time to time), "nearly all of the Trustee's energy in this case, and that of his professionals, has been focused since the end of June on dealing with these Capital Source [sic] claims," (Hearing Transcript at 9 ln. 19-22 (remarks of Attorney Shaiken).)

amounts of documentation for primarily "Fortune 25" companies and large law firms. (*See* Hearing

Transcript at 32.)[29] Prior to September 5, 2003, the Debtor was owned (directly or indirectly) by Dan

Gordon. In September, 2003, Holding (a corporation the majority interest in which was owned by one

or more Thoma Cressey entities) purchased all of the stock of the Debtor from the Gordon interests (the

"LBO").[30] The purchase price was in the approximate amount of $55,000,000.00. The Thoma Cressey

interests put $31,000,000.00 in cash into the purchase. The remainder of the purchase price was

financed by a secured loan from CSF in the amount of $21,000,000.00.[31] (*See* Hearing Transcript at

33.)

2003 was the Debtor's "banner year" in which the Debtor had gross income of about

$47,000,000.00. (*See* Hearing Transcript at 38.)[32] In 2004, gross income dropped to about

$33,000,000.00 and in 2005 to about $20,000,000.00. (*See id.*) The reasons for the downturn in the

Debtor's business were outdated equipment and difficulties in bringing in sales due, in part, to

increased competition. (*See id.* at 52.) By 2005, the Debtor was in "dire straights," (*see id.* at 39). The

---

[29]     The Debtor is a Delaware corporation. (*See* Trustee Exh. 4 (Amended and Restated Certificate of Incorporation of Daticon, Inc.).)

[30]     A leveraged buyout refers to the acquisition of a company (target corporation) in which a substantial portion of the purchase price paid for the stock of the target corporation is borrowed and where the loan is secured by the target corporation's assets.

*In re Oxford Homes, Inc.,* 180 B.R. 1, 8 (Bankr. D. Me. 1995).

[31]     The CSF Loans also included a revolving credit facility in the amount of $10,000,000.00. The Debtor was the primary and ultimate obligor on the CSF Loans; Holding was a guarantor. The CSF Loans were secured by, *inter alia,* all of the assets of the Debtor and are the source of CSF's secured claims in this case. (*See* Trustee Exh. 4 (loan documents).) As part of its security package, CSF received a pledge of all Holding's stock in the Debtor. (*See* Trustee Exh. 4, tab 11 (the "Pledge Agreement").)

[32]     As is apparent from the question to which he was responding, the Trustee misspoke when he referred to "2002" instead of "2003." (*See id.*)

- 19 -

Trustee recounted a telephone interview he had with Carl Thoma (the principal of Thoma Cressey) as

follows:

> [Carl Thoma] . . . advised me that . . . somewhere in the area of February, March of '05
> that he and his company, Thoma Cressey, considered . . . [their] equity investment . .
> . [to be] worthless at that point . . . and they basically just wanted out.
>
> . . . [T]hey didn't see any return on investment.  They did not see that this company was
> going to come around, and he wanted to jump to the next deal, but basically close the
> door on . . . [the Debtor] and look at the next deal.

(Hearing Transcript at 39 ln. 19-25, 40 ln. 22-25, 41 ln. 1.)

The Debtor hired Armand Lucarelli and Capital Restorations as "turnaround" experts in early

2005.  (*See id.* at 42.)  Mr. Lucarelli recommended that the Debtor's senior management be fired and

that he be put in place as "Chief Turnaround Officer" (or the like).  (*See id.* at 44.)  The Thoma Cressey

Board refused to follow those recommendations.  (*See id.* at 45.)  Instead, the Thoma Cressey Board

quit and "threw the keys at . . . [CSF]," (*id.* at 46 ln. 19).[33]  With the Thoma Cressey Board gone, there

needed to be a board in its place.  On or about May 16, 2005, CSF appointed the New Board pursuant

to the Pledge Agreement.[34]  Two of the members of the New Board were attorneys with the well-known

New York law firm of Moses & Singer; the other two members were with the well-respected

"turnaround" company, Getzler Henrich.  (*See* Hearing Transcript at 54-56.)  Before the New Board

---

[33]     "They weren't fired [by CSF].  They left."  (*Id.* at 46, ln. 18.)  The Trustee was surprised
that the Thoma Cressey Board had quit rather than had been fired "[e]specially because all the
indications earlier was that . . . [CSF] took control of the . . . [Debtor], and that's not actually what
happened.  It appeared that [Carl Thoma] . . . not only stepped down, but wanted absolutely nothing
to do with the company at that point."  (*Id.* at 47 ln. 17-21.)

[34]     (*See also* Trustee Exh. 10 and 11 (appointment instruments).)  The Debtor hired TRG
as its management consultant on or about May 24, 2005.  (*See* Doc. I.D. No. 178 at 32 (transcript of
January 26, 2006 hearing on the TRG Application).)

would accept appointment by CSF, its members required that CSF enter into the Indemnification

Agreement.  (*See id.* at 69-70.)[35]

> Upon appointment,
>
> the [N]ew Board came up to [the Debtor's headquarters] . . . on several occasions and
> interviewed all the key employees of . . .[the Debtor], to try to get an understanding of
> what the company did, what made it successful and why it was where it was.
>
> And also try to devise a plan whereby . . . [the Debtor] could cut costs and try to . . .
> pick sales up.  Try to save the company.

(*Id.* at 57 ln. 4-11.)  Although CSF wanted to implement the Armand Lucarelli recommendations, the

New Board refused to do that.  (*See id.* at 61.)  Moreover, "towards the end of '05, . . . [the New Board]

actually had . . . [CSF] pay back a couple of payments so . . . [the Debtor] could pay . . . payroll.  So,

. . . [CSF] gave concessions of about half a million dollars, while not [sic] other creditors were doing

the same thing at that time period."  (*Id.* at 61 ln. 25 and 62 ln. 1-5.)

"There came a point in time where the [New] Board realized that the . . . [Debtor] could not be

salvaged as an ongoing entity," (Hearing Transcript at 65 ln. 7-8), and the New Board decided to try

to sell the company.  (*See id.* at 65.)  That decision to sell was an independent decision by the New

Board.  (*See id.* at 64.)  The Debtor entered into a contract with Mirus as investment banker.  In order

to induce Mirus to enter into that contract, CSF entered into the Carve-Out Agreement with Mirus with

respect to payment of certain of Mirus' investment banker fees under certain conditions.[36]  Mirus was

hired and immediately set out to find prospective buyers for the Debtor.  (*See id.* at 65-66.)  Prospective

buyers "all seemed to have an interest in purchasing the business through a [Bankruptcy Code §] 363

---

[35]     (*See also* Trustee Exh. 12 (Indemnification Agreement).)

[36]     A copy of the Carve-Out Agreement is in the record as Trustee Exh. 14 and 15.

sale in a bankruptcy proceeding, and that was the end of last quarter . . . [of] '05." (*Id.* at 67 ln. 5-8.)[37]

It is not clear whether the New Board had the potential tax consequences of an asset sale analyzed

either prepetition or postpetition, but the Trustee assumed that no such analysis had been done. (*See*

Hearing Transcript at 108-09.)

With respect to claims that CSF "dominated" the New Board to the detriment of the Debtor

and/or its creditors, the Trustee testified in relevant part as follows:

> I started learning that . . . the Thoma Cressey Board wasn't thrown out. That they
> walked off. And . . . I started learning . . . that . . . [the New Board] . . . actually acted
> independently of . . . [CSF]. They made their own determinations . . . . I certainly came
> to the conclusions that they weren't controlled by . . . [CSF]. And I remember these
> things, because these weren't the conclusions I wanted to come to . . . . And certainly
> speaking to a lot of the parties who were involved in the Chapter 11, they got me very
> excited in that there may be some very good claims against . . . [CSF and the New
> Board] . . . .
>
> . . . [B]ut the investigation that I did . . . [with Special Counsel] led me just to the
> opposite conclusion . . . . I believed, reading the transcripts, speaking to the individuals
> on the phone, speaking to . . . [Special Counsel], that I think if this matter were ever
> litigated, I think they would be excellent witnesses. And I don't know what they did
> wrong.
>
> . . .
>
> . . . There was not one . . . smoking gun. There was not one document . . . [and] we
> didn't have a witness. And I remember beating you [*i.e.*, Special Counsel] up and you
> being very frustrated at me, telling you to prove to me this case. Build a case. And I
> remember you yelling at me that you can't make something that's not there . . . .

(Hearing Transcript at 58 ln. 8-24, 59 ln. 5-12, 60 ln. 3-9.)

With respect to a claim (arising out of the LBO) that CSF's security interest was avoidable as

a fraudulent transfer, the Trustee testified in relevant part as follows.

---

[37]     As noted above, the Debtor valued its assets at less than $10,000,000.00 in its Schedules.
The Debtor went into chapter 11 on January 17, 2006 with the Xiotech Bid as a "stalking horse" bid
in the maximum amount of $19,000,000.00. The Asset Sale to Xiotech for about $29,100,000.00 closed
on February 22, 2006.

[W]e did this analysis under the leverage[d] buyout to see if there was a fraudulent conveyance that arose.  And there has [sic] . . . to be certain elements that need to be met . . . insolvency elements . . . or rather the company was left with . . . an unreasonably small amount of capital or assets to run its business . . . . [Blum Shapiro concluded that it would be difficult to show t]hat the [D]ebtor was insolvent at the time . . . .

Additionally Rich Finkle [of Blum Shapiro] reviewed the projections made at the time of the LBO by Thoma Cressey.  That would have brought us to September 5th of '03. He reviewed several of Thoma Cressey's projections going forward.  He reviewed credit memos, underwriting memos, and projections of . . . [CSF], and his ultimate determination was that those projections were . . . not unreasonable at the time.

Again, there was a period of time when I first became Trustee where I was very excited about these claims . . . I remember being very frustrated over the fact that no matter where I looked, no matter where I turned I wasn't able to find any wrongdoing.

(Hearing Transcript at 105 ln. 4 to 106 ln. 13.)  The Trustee and Special Counsel "talked about that it would be a very large number to actually litigate the LBO issue . . . ."  (Hearing Transcript at 119 ln. 16-17.)

With respect to a claim that the New Board breached its fiduciary duty to the Debtor's creditors while the Debtor was in the "zone of insolvency," the Trustee testified that Blum Shapiro had analyzed the Debtor's trade debt and had concluded that it had remained at the same level during the year 2005. (*See* Hearing Transcript at 105, 124.)  Blum Shapiro performed that analysis because "we wanted to see whether or not the [New] Board was unreasonably running up debt, not paying debt . . . .  [W]ere they doing anything that directly damaged the corporation at that point in time," (Hearing Transcript at 124 ln. 24-25, 125 ln. 1-2.)

With respect to claims against the New Board that it had breached its fiduciary duty to the Debtor and/or its creditors by generating the Capital Gains Tax through the Asset Sale, as noted above the Trustee testified that the New Board made an independent decision to pursue the Asset Sale based upon the New Board's growing realization that the Debtor could not be salvaged as an ongoing entity

- 23 -

(*see* Hearing Transcript at 64-65) and that prospective purchasers seemed to be interested only in a

Section 363 purchase of the Debtor's assets in bankruptcy (*see id.* at 67).  The Trustee further testified

as follows:  "I was told again and again by primarily Dave Shaiken [*i.e.*, Special Counsel] that everyone

came to the same conclusion, that the [New] Board was an experienced Board, and the [New] Board

did as good a job as they could have done with what they had to work with."  (Hearing Transcript at

107 ln. 19-23.)  The Trustee further testified that "I don't know that there were other options [to the

Asset Sale], because we kept hearing that the company was unable to generate sales as it had back in

the early 2000's . . . .  Without the ability to generate sales and having outdated equipment, I don't see

how a reorganization would have been feasible."  (Hearing Transcript at 126 ln. 1-7.)  The Trustee

testified that he believed that the incurrence of the Capital Gains Tax did not damage the Debtor

because there were no good alternatives to the Asset Sale at the time.  (*See* Hearing Transcript at 110.)

The Trustee further testified as follows.  Based upon his assessment of the underlying facts and

the complexity, expense, inconvenience and delay of potential litigation against CSF and/or the New

Board, the Trustee came to the conclusion that the matter needed to be settled.  (*See* Hearing Transcript

at 95-96.)  Negotiations with CSF took about a month, ending in a six to eight hour session at Special

Counsel's offices.  Those negotiations were arm's length negotiations and the Trustee was represented

by Special Counsel in those negotiations.  (*See* Hearing Transcript at 94.)  In reaching the Proposed

Settlement, the Trustee attributed no value to potential claims against CSF or the New Board because

"its hard to attribute [value to] something . . . that's not there."  (Hearing Transcript at 122 ln. 10-11.)

The Trustee did not give much weight in the Proposed Settlement to the Mirus Reimbursement claim

because, in light of this court's February 9, 2006 ruling on the Mirus Application, the Trustee thought

that CSF's claim against the estate was weak in that regard.  (*See* Hearing Transcript at 73-74.)

Similarly, CSF's assertion of attorneys' fees (and an expert witness fee) as part of its secured claim was

only a "small part" of the Proposed Settlement.  (Hearing Transcript at 82 ln. 19.)[38]  The primary element with respect to his entry into the Proposed Settlement was the Exit Fee.  (*See* Hearing Transcript at 82.)

> With respect to the Exit fee, the Trustee testified in relevant part as follows:
>
> I don't know [if CSF would or would not prevail on a trial of the Exit Fee issue] . . . . I don't believe there's any precedent.  There's [sic] similar cases dealing with . . . prepayment issues.[39]  I believe there were no cases that we found that dealt with the exact issue, an exit fee issue.
>
> And [CSF] . . . felt strongly about it.  They looked me in the eye and told me that . . . even if they lost that issue in front of this court, they would certainly pursue it in other venues.
>
> So, . . . its really a flip of the coin whether . . . or not [CSF] could have prevailed dealing with the exit fee issue.
>
> I think . . . my argument under [Bankruptcy Code §] 506(b) is that it's not reasonable, taken [in light of] the interest of the unsecured creditors . . . And . . . I had a meeting with . . . [CSF] and it's [sic] officers involved in this transaction, and they explained to me that – and it made sense to me when they explained that when . . . the loan originated, there is an expectation that the lender is going to make a certain amount of money . . . off of the transaction, and in this particular case – possibly to the benefit of [the Debtor] . . . , putting a lower interest rate up front, that that money would be paid at the back end of the loan.  And I know that we interviewed several perspective [sic] expert witnesses at my direction who explained what I just indicated in a very similar manner.  I don't think that we were able to find one witness who would testify that that was not reasonable, except for one individual who I think . . . was looking for work and would have said whatever we wanted him to say . . . but that was fairly apparent.

---

[38]     Copies of redacted versions of Brown Rudnick's (CSF's counsel's) invoices to CSF are in the record as Trustee Exh. 17.  That exhibit was admitted over the objection of CSF.  (*See* Hearing Transcript at 87-92.)  Copies of invoices related to CSF's expert witness' fees are in the record as Trustee Exh. 18.  The Loan Agreement provided for CSF's recovery of attorneys' fees and collection costs at least under certain circumstances.  (*See* Trustee Exh. 4 (Loan Agreement at § 14.7 ("Expenses")).)

[39]     By definition, prepayment fees are paid only when the loan is paid before expiration of its term.  However, pursuant to Section 3.4 of the Loan Agreement the Exit Fee became payable whenever the Term Loan (as defined in the Loan Agreement) was paid (whether at maturity, upon acceleration, upon prepayment or otherwise).  (*See* Trustee Exh. 4 (Loan Agreement at § 3.4).)

> But . . . [Special Counsel and I] . . . spoke to several officers, loan officers and professionals, to try to get an indication of what the testimony might look at.  So, we paid a lot of attention to that.
>
> . . .
>
> . . . [Special C]ounsel was telling me that – and I gave deference to my counsel, but they were telling me that the court might come in somewhere in the area of $750,000.00 to $800,000.00 if the [Exit Fee] matter were actually litigated from beginning to end.  And I spent a large amount of time going back and forth with Attorney Shaiken [Special Counsel], who ultimately, and eventually, convinced me that his analysis was . . . not inaccurate.
>
> . . . I asked Attorney Shaiken how much – if just the exit fee were to be litigated . . . and no other issues, and he estimated that his firm's fees and expenses would be in excess of $100,000.00.[40]

(Hearing Transcript at 74 ln. 22 to 76 ln. 4, 118 ln. 4-10, 22-25.)

> In further support of the Proposed Settlement, the Trustee further testified as follows:
>
> [B]asically what I'd be risking by not settling this case based upon the weakness of the claims . . . – and the uncertainty of the claims that I indicated.  I'm really risking the . . . payment [on the Priority Tax Claim of] . . . the . . . priority creditor . . . .
>
> And based upon the amount of money that I've spent so far, in a very short amount of time, and the amount of work that I know that has to be done, and seeing the amount of fees and costs that . . . [CSF] . . . has incurred, if this matter were to be litigated and I would lose, it would be detrimental to the estate.  Not only is it possible that there might not be a payment . . . [on the Priority Tax Claim], but in the worse [sic] case result, we may actually get into the chapter 11 administrative claims.

(Hearing Transcript at 77 ln. 17 to 78 ln. 6.)  The Trustee further testified that, if the Settlement Amount

is paid before the end of calendar year 2006, the Capital Gains Tax effectively will be reduced by about

$440,000.00 (the "Tax Benefit").  (*See* Hearing Transcript at 29.)

---

[40]       It is unclear whether that estimate is for trial only or also includes appeal(s).

## VI.    ANALYSIS

### A.    Standards

Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." F. R. Bankr. P. 9019(a).   The bankruptcy court "may only approve a proposed settlement after an independent determination that it does not 'fall below the lowest point in the range of reasonableness'." *Nisselson v. Carroll (In re Altman),* 302 B.R. 424, 425 (Bankr. D. Conn. 2003) (Shiff, J.), *citing In re Best Prods. Co.,* 177 B.R. 791 (S.D.N.Y. 1995), *aff'd,* 68 F.3d 26 (2d Cir. 1995).   "[T]he responsibility of the bankruptcy judge . . . is not to decide the numerous questions of law and fact raised by . . . [the objector] but rather to canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness." *Anaconda - Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.),* 762 F.2d 185, 189 (2d Cir. 1985) (internal quotation marks omitted).   The burden of persuasion is on the trustee putting forth the proposed settlement. *Martin v. Kane (In re A&C Props.),* 784 F.2d 1377, 1381 (9th Cir.), *cert denied.,* 479 U.S. 854 (1986).

The bankruptcy judge should not simply "'rubber stamp' the trustee's proposal." *Depoister v. Mary M. Holloway Found. (In re Depoister)*, 36 F.3d 582, 587 (7th Cir. 1994).   The court must

> weigh all factors bearing on the reasonableness of the settlement, including: 1) the probability of success of the litigation; 2) the difficulties, if any, to be encountered in the matter of collection; 3) the complexity of the litigation involved, and the expense and inconvenience in delay necessarily attending it; and 4) the paramount interest of the creditors and a proper deference to their reasonable view.

*In re Matco Electronics Group, Inc.,* 287 B.R. 68, 75 (Bankr. N.D.N.Y. 2002) (internal quotations omitted).   However, "[t]he [bankruptcy] judge . . . is not to substitute her judgment for that of the trustee, and the trustee's judgment is to be accorded some deference." *Healthco Int'l*, 136 F.3d at 50 n.5 (internal quotation marks omitted) (alterations in original).   "[C]ourts need not conduct an

independent investigation in formulating an opinion as to the reasonableness of a settlement; rather, they may give weight to the trustee's informed judgment that a compromise is fair and equitable and to the competency and experience of counsel who support the settlement." *In re Altman,* 302 B.R. at 425-26.[41]

### B.    The Merits of the Proposed Settlement

### 1.    Release of Claims Against CSF and the New Board

Liberty Bank argues that the Trustee has attributed insufficient value to his release of the estate's potential claims against CSF and the New Board.  Liberty Bank asserts that CSF and/or the New Board may be liable to the estate in respect of the Capital Gains Tax and for other reasons. Liberty Bank suggests many theories of potential liability including: equitable subordination of CSF's claims on the theory that CSF was an "insider"/fiduciary for the Debtor and/or its creditors; liability on the theory that CSF was the "controlling shareholder" of the Debtor; liability on the theory that CSF "dominated" the New Board; liability on the theory that the New Board breached its duty of care and/or duty of loyalty to the Debtor or committed corporate waste.[42]  None of those theories impose liability on a *per se* basis; every theory requires that the defendant shall have engaged in some manner of wrongful, unfair or inequitable conduct (although some theories reverse the burden of proof on that issue).  *See, e.g., In re N&D Properties, Inc.,* 799 F.2d 726, 731 (11th Cir. 1986) (requirement of "inequitable conduct" for equitable subordination).  The Trustee is an experienced and competent

---

[41]    Although the court need not conduct an independent factual investigation but may defer to an appropriate investigation by the trustee, the court must make an independent determination as to the reasonableness of the settlement based on that investigation.  *See id.*

[42]    As noted above, the Trustee testified that he also considered potential liability on a "zone of insolvency" theory and with respect to the LBO.

trustee.  He was assisted by experienced, highly competent and skilled counsel.[43]  Based on the record

set forth above, the court finds that the Trustee conducted an appropriate, extensive and expensive

investigation.  The result of that investigation is that the Trustee finds himself unable to say that any

relevant person did anything wrong.  The court will defer to the Trustee's informed judgment on that

point for these purposes.

Liberty Bank emphasizes that the Asset Sale produced the Capital Gains Tax and argues that

CSF and/or the New Board ought to be liable for that.  The Trustee testified that a tax analysis should

have been performed in connection with the Asset Sale and it is not clear that one was.  However, based

on the investigation the Trustee performed with Special Counsel, the Trustee believes that the foregoing

is irrelevant because the Asset Sale was the only realistic opportunity for unsecured creditors to realize

anything from the Debtor's business (by liquidation or otherwise).  The court will defer to the Trustee's

informed judgment on that point for these purposes.

As discussed above, the Trustee does not believe that he could prevail in litigation against CSF

and/or the New Board.  Moreover, that litigation would be complex and expensive.[44]  The worst case

analysis is that the Trustee would litigate and lose; resulting litigation fees and expenses would deplete

the estate to the detriment of the holder(s) of the Priority Tax Claim and perhaps other priority

claimants.  Liberty Bank wants to "roll the dice" with the priority claimants' money.  However, under

these circumstances, the Trustee properly can elect to conserve estate assets by not prosecuting claims

---

[43]     Special Counsel recommends the Proposed Settlement which also is approved by the
UST.  It should be noted that, because Special Counsel also was Committee Counsel, Special Counsel
personally experienced the chapter 11 phase of this case.

[44]     It is worth noting that Special Counsel, a very knowledgeable person with respect to the
litigation, has expressed no appetite for prosecuting the litigation for the estate on a contingent fee
basis.  (See Hearing Transcript at 137 (remarks of Attorney Shaiken).)

against CSF and the New Board and may release such claims as a condition to an otherwise proper settlement.[45]

### 2.    Settlement of CSF's Claims

The Trustee considered both the Mirus Reimbursement and the attorneys'/expert witness fee components of the Proposed Settlement to be minor factors with respect to that settlement and "key[ed] in on the [E]xit [F]ee," (Hearing Transcript at 82, ln. 14).  The court will do likewise.

"[R]easonable fees" due the secured party under the terms of its loan/security documents are recoverable from its surplus collateral under Bankruptcy Code § 506(b).  Although there is case law dealing with the treatment of prepayment premiums under Section 506(b), as noted above the Exit Fee is not due on prepayment but is due whenever the loan is paid or becomes due.  The parties have not identified any cases dealing with the treatment of such a fee under Section 506(b), nor has the court itself located any such cases.  The parties are in agreement that the Section 506(b) inquiry with respect to the Exit Fee would be equitable in nature.

Reasonably anticipating that at least some expert testimony would be required, the Trustee searched for but was unable to locate an expert witness who would provide helpful testimony.  (*See* Hearing Transcript at 75.)  Given the foregoing and the dirth of relevant case law, the Trustee reasonably viewed the allowability of the Exit Fee under Section 506(b) to be a "flip of the coin," (Hearing Transcript at 75 ln. 5).  The worst case scenario is that the Trustee would litigate the Exit Fee issue and secure no reduction.  In that case, the estate would be depleted by $1,250,000.00 plus $100,000.00 in Special Counsel's fees (*see* Hearing Transcript at 118) plus CFS's fees (*see* Trustee Exh. 4 (Loan Agreement at § 14.7)).  There would be no mitigating Tax Benefit.  Based upon Special

---

[45]    It is a fair inference that CSF insisted on a release of the New Board as a condition of its entry into the Proposed Settlement because of CSF's exposure on the Indemnity Agreement.

- 30 -

Counsel's analysis, the Trustee believes that the most likely result is that the Exit Fee would be allowed as a secured claim in the $750,000.00 to $800,000.00 range.  (*See* Hearing Transcript at 118.)  Thus, under that scenario, the estate would be depleted by that amount, plus $100,000.00 for Special Counsel's fees plus CSF's fees.  Again, there would be no Tax Benefit to mitigate that result.

Under the Proposed Settlement, the Trustee obtains a reduction in the Exit Fee of about $150,000.00, paying CSF $1,101,228.77.  However, the Trustee spares the estate litigation fees and expenses (both his own and CSF's) *and* he obtains the Tax Benefit of $440,000.00.  That yields a net depletion to the estate of about $660,000.00.  Although neither the Trustee nor the court can quantify CSF's attorneys' fee claim (because of the redacted invoices), the Trustee reasonably concluded that such claim is worth at least something and the Proposed Settlement spares the estate payment of that claim as well.  Under those circumstances, the Trustee has made a reasonable choice.[46]

Liberty Bank suggests that the Trustee could pay CSF the Settlement Amount before the end of this year with a full reservation of rights (assuming that the foregoing would secure the Tax Benefit), and litigate (both defensively and offensively) with CSF in the future (subject to the Bar Provision). Even assuming that the foregoing is feasible and efficacious (Liberty Bank does not offer a reliable tax opinion), Rule 9019 does not require that a proposed settlement be a trustee's only choice, only a reasonable choice.

---

[46]    The court declines to attribute any value to the Mirus Reimbursement claim.  A potential Subrogation Claim and/or the claims of the New Board for indemnity are neutral factors because they "are what they are" under any scenario.  The substitution of a new letter of credit for the LOC has no effect on the estate (merely substituting one secured creditor for another) except with respect to about $11,000.00 in fees.  (*See* Doc. I.D. No. 567.)

### 3.    Approval of the Proposed Settlement

Taking into account the analysis set forth above and applying the factors set forth in *Matco Electronics Group, supra,* the court concludes that, although the second factor is inapplicable here, the first, third and fourth factors favor approval of the Proposed Settlement.  For all of the reasons set forth above, the court finds and/or concludes that the Proposed Settlement is fair, reasonable, equitable and in the best interests of creditors and the estate and ought to be approved.  Because there is no objection to the LOC Motion other than that it is part of the Proposed Settlement, the LOC Motion should also be granted.

## VII.   CONCLUSION

For the reasons set forth above, the Motion To Approve Settlement and the LOC Motion shall be granted and the Liberty Bank Objection shall be overruled.[47]  It is **SO ORDERED.**

Dated: December 22, 2006                              BY THE COURT

*Lorraine Murphy Weil*

**Lorraine Murphy Weil**
**United States Bankruptcy Judge**

---

[47]      Separate orders shall enter with respect to the Motion To Approve Settlement and the LOC Motion.

- 32 -